2011 UT App 333

**Patricia NIEMELA, Plaintiff and Appellant,**

v.

**IMPERIAL MANUFACTURING, INC., dba Imperial Mailbox Systems; and John Does I–V, Defendant and Appellee.**

**No. 20100682–CA.**

Court of Appeals of Utah.

Sept. 29, 2011.

1192

Daniel F. Bertch and Kevin K. Robson, Salt Lake City, for Appellant.

Cory D. Memmott, Salt Lake City, for Appellee.

Before Judges THORNE, VOROS, and ROTH.

## OPINION

VOROS, Judge:

¶1 Plaintiff Patricia Niemela appeals the trial court's grant of summary judgment in favor of Defendant Imperial Manufacturing, Inc., dba Imperial Mailbox Systems, (Imperial) in her products liability action. We affirm.

## BACKGROUND

¶2 Niemela delivered mail for the United States Postal Service (USPS). Starting in 2001, her route included approximately 600 homes within the Overlake Homeowners' Association (the HOA) in Tooele, Utah. Nearly every home in this neighborhood had the same type of mailbox, manufactured by Imperial; in fact, the HOA fined homeowners who did not use the Imperial mailbox. Imperial designed and manufactured the mailboxes in 1995 and sold them to the Overlake developer sometime between 1995 and 2001. However, the mailboxes were not installed until 2001.[1] The mailboxes were designed with a three-quarter-inch circular knob on the door and holes in the top to affix an address plate. Allegedly due to the material with which the door hinges were made, over time the door would not align perfectly with the mailbox, allowing water to enter and freeze the door shut in cold weather. When a mailbox was frozen shut, Niemela would frequently use a hammer and screwdriver to pry it open; she also stated that the doors would catch when opened even when there was no ice.

¶3 After two or three years of delivering mail in the Overlake neighborhood, Niemela began to notice cramping and mild pain in her right hand when she had to force open a mailbox. She alleges that on December 5, 2005, she suffered a serious and permanent injury to her hand while struggling to open a mailbox. Her right hand was already inflamed and sore early into her route that day when, struggling to open another mailbox, she felt a shot of pain go up her arm. After resting at her nearby home, she finished her route using a hammer and screwdriver to open other frozen mailboxes. Niemela sought medical attention for her hand and was unable to return to full-time employment delivering mail with USPS.

¶4 Niemela brought a products liability action against Imperial, alleging strict liability, negligence, and breach of implied warranty for design and manufacturing defects. After discovery concluded, Imperial moved for summary judgment, which the trial court granted. Niemela appeals.

## ISSUES AND STANDARD OF REVIEW

¶5 Niemela challenges the entry of summary judgment in favor of Imperial, both as to her products liability claim and her negligence claim.[2] In determining whether summary judgment was appropriate, we view "the facts and all reasonable inferences ... in the light most favorable to the nonmoving party." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶36, 250 P.3d 465. "We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Id.*

## ANALYSIS

### I. Products Liability

¶6 In her products liability claim, Niemela alleges that the Imperial mailboxes contained design and manufacturing defects rendering them unreasonably dangerous. She seeks to

---

1. While there is some discrepancy as to when the mailboxes were sold and installed, this issue is not material to the resolution of this case.

2. Niemela does not address the trial court's dismissal of her breach of implied warranty claim. We therefore deem this claim waived.

demonstrate these defects by showing that the mailboxes did not conform to the 2001 USPS regulations, notwithstanding the fact that the mailboxes were designed and manufactured in 1995. Imperial responds that (1) the mailboxes must be presumed nondefective because they complied with federal regulations in effect when they were designed and manufactured, and (2) Niemela has not presented sufficient evidence to overcome this presumption.

¶ 7 Summary judgment "shall be rendered if … there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the [elements] of the prima facie case justifies a grant of summary judgment to the defendant." *Stevens–Henager College v. Eagle Gate College,* 2011 UT App 37, ¶ 14, 248 P.3d 1025 (alteration in original) (citation and internal quotation marks omitted).

▮▮▮ ¶ 8 "Products liability claims require proof of a defective product, which can include manufacturing flaws, design defects, and inadequate warnings regarding use." *Dimick v. OHC Liquidation Trust,* 2007 UT App 73, ¶ 8, 157 P.3d 347 (citing *Bishop v. GenTec Inc.,* 2002 UT 36, ¶ 25, 48 P.3d 218). A plaintiff must prove three elements to succeed in a strict products liability suit: "(1) that the product was unreasonably dangerous due to a defect or defective condition, (2) that the defect existed at the time the product was sold, and (3) that the defective condition was a cause of the plaintiff's injuries." *Id.* (citation and internal quotation marks omitted); *see also Gudmundson v. Del Ozone,* 2010 UT 33, ¶ 53, 232 P.3d 1059.

▮▮ ¶ 9 Although the tort of strict products liability is a creature of common law, *see Brown v. Sears, Roebuck & Co.,* 328 F.3d 1274, 1278–79 (10th Cir.2003) (applying Utah

law), the Utah Product Liability Act provides the standard for determining whether a product is defective.[3] Under this standard, a plaintiff must show that the product was unreasonably dangerous to the user or consumer at the time it was sold by the manufacturer or other initial seller:

> In any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product, a product may not be considered to have a defect or to be in a defective condition, unless at the time the product was sold by the manufacturer or other initial seller, there was a defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer.

Utah Code Ann. § 78B–6–703(1) (2008). As defined by the Act, the standard for "unreasonably dangerous" focuses on consumer expectations:

> As used in this part, "unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

*Id.* § 78B–6–702. The United States Court of Appeals for the Tenth Circuit has read this statute to encompass both an objective and a subjective consumer expectations test. *See Brown,* 328 F.3d at 1280–82. Under the objective test, "[t]he issue, roughly speaking, is whether an ordinary person would think the product is less dangerous than it is." *Id.* at 1280. The subjective test considers, in addition, the particular user's expectation of danger, given her "actual knowledge, training, or experience." *See* Utah Code Ann. § 78B–6–702; *Brown,* 328 F.3d at 1281–82.

---

3. For twenty-three years, even the ostensibly statutory standard was effectively based in common law. The statute was declared void in 1985 and not re-enacted until 2008. *See Egbert v. Nissan Motor Co.,* 2010 UT 8, ¶¶ 10–11, 18, 228 P.3d 737. "For cases filed after [its invalidation] but before the 2008 recodification, [the defective products statute] was not statutory law, but the

rule contained therein was in force as part of the common law." *Id.* ¶ 21. Although Niemela filed before the 2008 recodification took effect, we follow the supreme court's lead in referring to the current statute in cases filed before the recodification where "the change does not affect our analysis." *See Gudmundson v. Del Ozone,* 2010 UT 33, ¶ 47 n. 12, 232 P.3d 1059.

Such information "would ordinarily increase the particular person's appreciation of the product's danger." *Brown*, 328 F.3d at 1282. It thus "can only work against a plaintiff's claim that a product is unreasonably dangerous." *Id.* Consequently, "if a product is not 'unreasonably dangerous' under the statute's objective test, it is not necessary to consider the subjective information of the 'particular' person." *Id.*

 ¶ 10 The statute also creates a rebuttable presumption of nondefectiveness applicable to a product compliant with government standards:

> There is a rebuttable presumption that a product is free from any defect or defective condition where the alleged defect in the plans or designs for the product or the methods and techniques of manufacturing, inspecting and testing the product were in conformity with government standards established for that industry which were in existence at the time the plans or designs for the product or the methods and techniques of manufacturing, inspecting and testing the product were adopted.

Utah Code Ann. § 78B–6–703(2). To overcome the presumption, the plaintiff must prove by a preponderance of the evidence that the product is unreasonably dangerous. *Egbert v. Nissan North Am., Inc.*, 2007 UT 64, ¶¶ 14–16, 167 P.3d 1058.[4]

¶ 11 The mailboxes at issue here were designed and manufactured in 1995. As Niemela has acknowledged, in 1995 the USPS found them to conform to its then-current 1992 regulations. The mailboxes thus enjoy a presumption of nondefectiveness based on the 1992 regulations. *See* Utah Code Ann. § 78B–6–703(2). However, the USPS regulations were revised in 2001. Niemela seeks to rebut the presumption of nondefectiveness by showing that the mailboxes were not in compliance with the 2001 regulations.

¶ 12 The Act itself forecloses Niemela's argument. Section 78B–6–703(2) specifies that the relevant government standards are those "in existence at the time the plans or designs for the product ... were adopted." *Id.* Niemela advocates an approach that would permit a presumption based on government standards in existence at the time the product was designed to be rebutted by reference to later government standards, even if the later standards were not in existence at the time the product was designed. This approach would, contrary to the statute's clear requirement, make the touchstone of the presumption compliance with government standards not yet "in existence at the time the plans or designs for the product ... were adopted." *See id.*

 ¶ 13 Niemela also argues that, even without resorting to the 2001 governmental standards, "[t]he litany of problems posed by the small knob Imperial mailbox is sufficient to create an issue of fact as to defective design." She devotes only a single paragraph to this argument, citing the following characteristics as evidence that the mailbox

---

4. The proof required to rebut the presumption appears to be identical to the proof required to establish the first element of a prima facie case. *See Dimick v. OHC Liquidation Trust*, 2007 UT App 73, ¶ 8, 157 P.3d 347 ("To prevail on a strict products liability claim, a plaintiff must demonstrate (1) that the product was unreasonably dangerous due to a defect or defective condition...." (citation and internal quotation marks omitted)). Thus, with or without the presumption, the plaintiff must prove by a preponderance of the evidence that the product is unreasonably dangerous.

This fact has prompted some to suggest that "the statute is of no benefit to the manufacturer." *Egbert v. Nissan North Am., Inc.*, 2007 UT 64, ¶ 15, 167 P.3d 1058 (stating defendant's position). Our supreme court rejected this argument, reasoning that "the presumption clearly communicates to the jury that, for the plaintiff to succeed, the plaintiff must overcome ... the presumption that a product is nondefective because of the manufacturer's compliance with government safety standards." *Id.* ¶ 16. We understand this statement to mean that, while the plaintiff must prove that the product was unreasonably dangerous regardless of whether the presumption applies, as a practical matter, a properly instructed jury is less likely to conclude that a product is unreasonably dangerous if the product complies with applicable government standards. Thus, the two standards, though identically worded, are not necessarily identically onerous.

In addition, the Legislature may have envisioned a case where the plaintiff attempts to rebut the presumption by showing that a product, though compliant with government standards, is unreasonably dangerous in a way those standards do not contemplate.

was unreasonably dangerous: (1) the handle diameter was too small; (2) the handle depth was too shallow; (3) holes in the top of the mailbox allowed water to enter and ice to form at the hinge; and (4) the door hinges were exposed, further allowing water to enter and freeze. In arguing that these characteristics made the mailbox more dangerous than would be contemplated by the ordinary and prudent user, she refers to "the stark difference between the Imperial mailbox in question and the Imperial mailbox with the larger, deeper knob." She also refers to "the difference between the Imperial mailbox in question and the ordinary aluminum mailboxes." This is the sum and substance of her argument.

¶ 14 In our judgment, the mailbox flaws Niemela cites are insufficient evidence for a jury to conclude that the mailbox was "dangerous to an extent beyond which would be contemplated by the ordinary and prudent ... user of that product ... considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by" Niemela. *See* Utah Code Ann. § 78B–6–702 (2008). Proof that the plaintiff was injured by a product, without more, is insufficient to establish that a product is unreasonably dangerous. *See Kleinert v. Kimball Elevator Co.*, 854 P.2d 1025, 1027 (Utah Ct. App.1993) (holding that evidence that plaintiff was "tossed about the inside of [an] elevator" for forty minutes was insufficient to survive summary judgment in products liability claim against manufacturer, although it was sufficient to reach a jury on a claim against landlord for failure to repair); *see also Burns v. Cannondale Bicycle Co.*, 876 P.2d 415, 418 (Utah Ct.App.1994) (" '[T]he

fact that someone was injured while using a product does not establish that the product was unreasonably dangerous when put to its intended use.' " (quoting *Brooks v. Colonial Chevrolet–Buick, Inc.*, 579 So.2d 1328, 1332 (Ala.1991))). Nor do we agree that the allegedly unreasonable danger inherent in the size of a mailbox knob is self-evident, especially where by her own account Niemela apparently opened the mailbox over a million times before the culminating injury occurred.[5] Finally, the fact that another make or model of mailbox is easier to use or even safer does not prove that the mailbox in question is unreasonably dangerous. *Cf. Slisze v. Stanley–Bostitch*, 1999 UT 20, ¶ 10, 979 P.2d 317 (holding that, while manufacturer has duty to warn against a product's latent hazards, it has no duty to warn the consumer that a safer model exists).

¶ 15 This would be quite a different case if Niemela could show that the mailbox violated applicable safety standards designed to protect against the injury she experienced. *See Gudmundson v. Del Ozone*, 2010 UT 33, ¶¶ 49–50, 232 P.3d 1059 (holding that plaintiff's proof that ozonizer lacked shut-off valve required by OSHA standards and that prison officials were aware that ozone levels sometimes exceeded acceptable levels was sufficient to survive summary judgment). But here, even assuming without deciding that the USPS regulations at the time the mailbox was designed and manufactured were aimed at safety rather than convenience, the mailbox complied with, rather than violated, those regulations.[6]

## II. Negligence

¶ 16 Niemela also contends that Imperial was negligent in designing and manu-

---

**5.** Niemela alleges that she "opened and closed nearly 600 Imperial mailboxes every day, five days a week, fifty-two weeks a year for seven years."

**6.** It is far from clear that even the inapplicable 2001 regulations upon which Niemela relies are aimed at carrier safety rather than convenience, efficiency, or protection of the mail from the weather. For example, those regulations require that "[t]he handle or knob shall have adequate accessibility to permit *quickly* grasping and pulling it with one hand," 66 Fed.Reg. 9512, § 3.4.1 (Feb. 8, 2001) (emphasis added), not *safely*

grasping and pulling it with one hand. In contrast, Niemela does not rely on those portions of the regulations explicitly aimed at safety, such as the section stating that "[t]he unit must not have sharp edges, sharp corners, burrs or other features (on any surfaces) that may be hazardous to carriers/customers." *Id.* § 3.14. In any event, because we have already decided that the 2001 USPS regulations do not control here, and because the parties did not brief the distinction between regulations aimed at carrier safety and regulations aimed at other concerns, we need not examine the distinction.

facturing a defective mailbox. The trial court rejected this claim on several grounds, including that she had failed to establish both duty and proximate cause. *See Stevens–Henager College v. Eagle Gate College*, 2011 UT App 37, ¶ 14, 248 P.3d 1025 ("A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the [elements] of the prima facie case justifies a grant of summary judgment to the defendant." (alteration in original) (citation and internal quotation marks omitted)).

¶ 17 A plaintiff claiming negligence in this context must prove the ordinary elements of negligence, including duty and causation. *See, e.g., Slisze,* 1999 UT 20, ¶ 9, 979 P.2d 317 ("One essential element of a negligence action is a duty of reasonable care owed to the plaintiff by [the] defendant. Absent a showing of duty, [the plaintiff] cannot recover." (citation and internal quotation marks omitted)); *Barson ex rel. Barson v. E.R. Squibb & Sons, Inc.,* 682 P.2d 832, 835 (Utah 1984) ("In a products liability case, the plaintiff must ... prove that there was a duty owed by the defendant to the plaintiff, that the duty was breached and that the conduct complained of was the cause in fact of the injury.").

¶ 18 The trial court ruled that Niemela failed to prove duty; in particular, she "failed to show that [Imperial] had prior knowledge or any knowledge that the manufactured handles/knobs caused injuries or were in any way defective." In addition, the court ruled, she failed "to provide expert or other testimony regarding the design of the handles/knobs of the mailboxes at issue."

¶ 19 When ascertaining whether a duty of reasonable care exists, a court should consider the following factors: "(1) the extent that the manufacturer could foresee that its actions would cause harm; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against it; and (4) the consequences of placing the burden on the defendant." *Slisze v. Stanley–Bostitch,* 1999 UT 20, ¶ 12, 979 P.2d 317 (citing *AMS Salt Indus. v. Magnesium Corp. of Am.,* 942 P.2d 315, 321 (Utah 1997)); *see also Hunt v. ESI Eng'g, Inc.,* 808 P.2d 1137, 1139 (Utah Ct. App.1991) ("It is clear that in negligence cases, a designer has a duty to design its product so as to eliminate any unreasonable risk of foreseeable injury." (citation and internal quotation marks omitted)); 1 Madden & Owen on Products Liability § 2:1, at 46 (3d ed. 2000) ("[T]he duty under negligence law [in a products liability case] is limited to *reasonable* care—not perfect care; to protecting only persons *foreseeably* placed at risk—not all persons; and to avoid only risks that are *foreseeable*—not all risks.").

¶ 20 Niemela's brief does not discuss these factors. It cites one case for the unobjectionable proposition that "failure to manufacture a product according to a safe design plan can result in liability" (citing *Jacobsen Const. Co. v. Structo Lite Eng'g, Inc.,* 619 P.2d 306 (Utah 1980)), and it cursorily declares inapposite one case relied upon by the trial court (citing *Slisze,* 1999 UT 20, 979 P.2d 317). Otherwise, her argument on this issue contains no reference to legal authority. Nor does it point to any record evidence of foreseeability of harm, likelihood of injury, magnitude of the burden of guarding against it, or consequences of placing the burden of protecting against harm on Imperial. *See Slisze,* 1999 UT 20, ¶ 12, 979 P.2d 317. She argues merely that the federal rulemaking process that culminated in the 2001 USPS regulations "necessitates the conclusion" that Imperial was on notice of "the proper knob size, and depth, and related issues to opening mailboxes." She also argues that "there is a question of constructive or inquiry notice about the reasonableness of the design of [Imperial's] mailbox." This line of argument is little more than an invitation to speculate on Imperial's knowledge of the mailbox's alleged defects.

¶ 21 This level of briefing is not adequate; accordingly, we decline to reach the merits of this argument. *See* Utah R.App. P. 24(a)(9); *State v. Thomas,* 961 P.2d 299, 305 (Utah 1998) ("Implicitly, rule 24(a)(9) requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority."); *State v. Sloan,* 2003 UT App 170, ¶ 13, 72 P.3d 138 ("An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the

reviewing court." (citation and internal quotation marks omitted)).

¶ 22 We see the issue of causation in much the same light. The trial court ruled that Niemela "failed in her burden to present evidence that her injuries were the proximate and actual result of [Imperial's] mailboxes." "[T]he causal connection between the alleged negligent act and the injury is never presumed[,] and . . . this is a matter the plaintiff is always required to prove affirmatively." *Fox v. Brigham Young Univ.*, 2007 UT App 406, ¶ 21, 176 P.3d 446 (omission in original) (citation and internal quotation marks omitted). "Although the question of proximate causation is generally reserved for the jury, the trial court may rule as a matter of law on this issue . . . if . . . there is no evidence to establish a causal connection, thus leaving causation to jury speculation." *Id.* (omission in original) (citation and internal quotation marks omitted); *see also Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 25, 48 P.3d 218 ("[P]roof of a defect under a negligent manufacture theory will necessitate proof that the defective condition of the product was the *result* of negligence . . . ." (emphasis added)). "[D]epend[ing] on the nature of the injury," establishing the causal link between negligence and injury often requires expert testimony. *See Fox*, 2007 UT App 406, ¶ 22, 176 P.3d 446 (citation and internal quotation marks omitted). "It is only in the most obvious cases that a plaintiff may be excepted from the requirement of using expert testimony to prove causation." *Id.* (citation and internal quotation marks omitted).

¶ 23 Again, Niemela's briefing on this point is inadequate. She devotes only three sentences to challenging the trial court's ruling on causation. She distinguishes *Fox v. Brigham Young University*, 2007 UT App 406, 176 P.3d 446, on the

ground that it "involved medical causation issues that were beyond the ken of an average juror." She then argues that, "[t]he problems Niemela and other customers experienced with the Imperial mailboxes were understandable to anyone who has used a mailbox, which is, basically, every potential juror." She cites no other authority, and her brief does not cite or discuss any of the myriad Utah cases discussing the level of proof necessary to survive a motion for summary judgment on the issue of causation in a negligence case. Accordingly, we decline to reach the merits of this claim. *See* Utah R.App. P. 24(a)(9); *Thomas*, 961 P.2d at 305; *Sloan*, 2003 UT App 170, ¶ 13, 72 P.3d 138.[7]

¶ 24 We recognize that lawyers operate within practical constraints. These might include the lawyer's workload, the client's resources, and the estimated value of the particular case. We also recognize that these constraints may be especially limiting for lawyers representing private individuals rather than institutional clients for whom litigation may represent a cost of doing business. Nevertheless, our system is designed so that the "appellant must do the heavy lifting," *State v. Robison*, 2006 UT 65, ¶ 21, 147 P.3d 448. An appellate court that assumes that burden on behalf of an appellant "distorts th[e] fundamental allocation of benefits and burdens." *Id.*

## CONCLUSION

¶ 25 With respect to Niemela's products liability claim based on strict liability, we agree with the trial court that Imperial is entitled to the presumption of nondefectiveness based on the uncontested fact that the mailboxes at issue conformed to government standards in effect at the time of their design and manufacture. The fact that these mailboxes were arguably inferior to later Imperial designs or to a more traditional design,

---

7. Even on the merits, however, we regard Niemela's claim as doubtful. Niemela compares herself to "the plaintiff who trips and falls, breaking a wrist"; in both cases, she asserts, causation "is apparent even to a lay person." However, unlike an injury resulting from a fall, the mechanism of causation alleged here involves no moment of impact. Rather, the injury allegedly occurred gradually over a seven-year period

as Niemela "opened and closed nearly 600 Imperial mailboxes every day, five days a week, fifty-two weeks a year for seven years." We do not agree that this is among the most obvious cases where "the causal connection between the breach of the standard of care and the harm suffered is apparent using common knowledge." *Bowman v. Kalm*, 2008 UT 9, ¶ 12, 179 P.3d 754.

and that Niemela was allegedly injured by opening and closing the mailboxes over a million times, fails to demonstrate that they were unreasonably dangerous. In addition, Niemela's products liability claim based on negligence is inadequately briefed.

¶ 26 Accordingly, we affirm summary judgment for Imperial.

¶ 27 WE CONCUR: WILLIAM A. THORNE JR. and STEPHEN L. ROTH, Judges.